**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| KAMIL KNAP and EPA USA, *Inc.* | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Civil Action No. _____ |
| | § | |
| R2P INVEST PTE.LTD., VIKTOR | § | |
| DOKUCAJEV, and LUBOS ZOVINEC, | § | |
| Defendants. | § | |

---

**ORIGINAL COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

---

**TO THE HONORABLE COURT:**

**PLAINTIFFS KAMIL KNAP** (“**Knap**”), individually, and derivatively on behalf of **EPA USA, Inc. (“EPA”)** (“Plaintiffs”), allege the following causes of action in this its **Original Complaint for Injunctive Relief and Damages** against **Defendants R2P INVEST PTE.LTD, VIKTOR DOKUCAJEV,** and **LUBOS ZOVINEC** (“Defendants”). In support, Plaintiffs would respectfully show the Court as follows:

## INTRODUCTION

1.     This action is brought by Knap, individually, and derivatively on behalf of EPA as a 33.4% shareholder EPA by Knap, against R2P Invest, Viktor Dokucajev, and Lubos Zovinec, who are EPA’s remaining majority shareholders. As the basis for this action, Plaintiffs allege the following conduct carried on by all Defendants, either individually or in concert with another, or in a representative capacity of R2P Invest PTE.LTD (“R2P Invest”) including but not limited to misappropriation by improper means of vital trade secrets necessary for the daily operation of EPA’s business practices, which such information includes federally protected consumer credit file information protected under various federal statutes such as the Gramm-Leach Bailey Act,

tortious interference current and prospective contracts, breach of fiduciary duties owed to EPA, and .

2.      On information and belief, the Defendants, acting individually and in concert with another, acting both individually and on behalf of R2P Invest through actual and apparent authority to bind R2P Invest from their actions, have prohibited Plaintiffs' access to certain confidential trade secret information which are located on secure server storage facilities in Phoenix, Arizona, and Palo Alto, California. Further, all Defendants have conspired to instruct other server database providers to intentionally prohibit Plaintiffs' use or access to such confidential trade secret information.

3.      The information Knap requests restoration and access to is essential to carrying out EPA's business practices, which the Defendants' conduct caused substantial diminution in value to such information and EPA's ability to conduct its daily business operations, the side effect being the loss of employment and livelihoods of at least 15 EPA full-time employees of EPA in Arizona and California. As discussed in further detail below, the Defendants are attempting to  as clearly carried on for the purpose of  , which requests temporary injunctive relief, permanent injunctive relief, and compensatory damages, among others to be proven at a trial on the merits against R2P Invest, is brought by Plaintiffs Kamil Knap ("Knap"), a permanent resident alien originally from the Czech Republic who resides in and conducts from the Phoenix, Arizona area. Knap is the President/Director of co-Plaintiff EPA USA, *Inc.* ("EPA" or "the company"), a corporation duly organized and existing under the laws of the state of California since the EPA organization in or around 2019.

4.      All at times relevant to this Complaint, Knap served as President/Director of EPA while the other two shareholders took on roles as silent partners given those individuals had limited

familiarity with Western culture, lacked knowledge of the specific nuances of the collections industry within the U.S., or the strict regulatory framework associated with lawfully running a debt collection agency.

## **PARTIES**

5.      Plaintiff, Kamil Knap, is Slovakian national and lawful E-2 Investor Visa holder issued by the U.S. Citizenship and Immigration Services.

6.      EPA USA, *Inc.*, is a corporation duly organized and existing under the laws of the state of California. identified as citizens of the state of Texas residing within the Eastern District of Texas.

7.      Defendant, R2P Invest PTE.LTD, is a foreign corporation registered under the laws of Singapore, with its registered address being 600 North Bride Road, #23-01 Parkview Square, Singapore 188778.

8.      Defendant, Viktor Dokucajev**,** is a Czech national and shareholder of R2P Invest PTE.LTD, who may be served with process by serving him at 600 North Bride Road, #23-01 Parkview Square, Singapore 188778.

9.      Defendant, Lubos Zovinec, Czech national and shareholder of R2P Invest PTE.LTD, who may be served with process by serving him at 600 North Bride Road, #23-01 Parkview Square, Singapore 188778.

## **JURISDICTION AND VENUE**

10.     Since EPA's formation in or around 2019, Knap has continuously resided in Phoenix, Arizona or Palo Alto, California. As part of Knap's business director duties for EPA as well as EPA employees working on behalf of EPA and at Knap's direction, contacted citzens of the state of Texas such that personal jurisdiction over Plaintiffs would not offend traditional

notions of fair play and substantial justice. Knap and EPA further conducted business with citizens of the state of Texas, and more particularly the Eastern District, on a regular, systematic, and continuous basis such that this Court's jurisdiction over Plaintiffs, and this dispute would not offend traditional notions of fair play and substantial justice.

11.     As a debt collector that contracts with multiple banking entities across the Southwestern U.S., EPA, and agents acting on behalf of EPA, maintain regular, systematic, and continuous contacts with citizens of the state of Texas as well as citizens located within the Eastern District of Texas. By way of example, EPA's largest client, Credit Union of Texas, has multiple branches in Texas and more particularly within the Eastern District of Texas. EPA, as a debt servicer for Credit Union of Texas, services those accounts which include thousands of accounts which have been identified as citizens of the state of Texas and more particularly citizens residing within the Eastern District of Texas.

12.     All Defendants, forming the individual defendants and the entity defendant, through the process of misappropriating and ultimately taking of Plaintiffs' trade secrets outside the United States were tortious acts intended to harm Knap as a 33.4% shareholder and his business clients that reside in Texas, such as Credit Union of Texas. Each defendants' actions in misappropriating Plaintiffs' trade secrets were directed at harming Knap and harming Knap in Texas because of Knap's many banking clientele that reside or otherwise conduct business in the state of Texas, and more particularly the Eastern District of Texas.

## FACTUAL BACKGROUND

### A.     Knap develops confidential trade secret information used in EPA's business, setting EPA apart from other competitors in the industry.

13.     EPA's business consists of serving as a debt collector or third-party debt collector for debts deemed uncollectable by EPA's bank clientele, and EPA then uses its proprietary

confidential trade secret information to determine which debtors' third-party debt collector or debt collector for accounts designated by EPA's banking clientele as defaulted, uncollectable or charged-off.

14.     As an essential part of EPA's business practices, Knap owns, and has developed and compiled over a significant amount of time certain proprietary information, including but not limited to customer information of EPA's banking clients whose accounts are identified in default, uncollectable, or charged-off; the names and contact information of those customers identified by EPA's bank clientele along with a contact number either for the principal abode of each debtor or the debtor's place of employment; the past due balance for each bank customer whose account has been identified as in default, uncollectable or charged-off; and, the contractual documentation evidencing each customer-debtor balance to the bank.

15.     In addition, Knap's confidential trade secret information contains public data drawn from various public databases that assist in assigning a numerical score for each debtor's ability to pay on a past due account owed to EPA's banking clientele; the average income for each zip code each debtor resides compared to the average income for the entire U.S.; detailed skip trace information including the current and previous property owned by each debtor and the respective value of such real property; the number of current and previous vehicles owned by each debtor and, when appropriate, the approximate value of each vehicle; and, if available, the employment information of each debtor and the debtor's estimated annual salary.

16.     After Knap places this information a proprietary database, a numerical score is generated regarding each debtor, which serves as a threshold or baseline whether EPA or its banking clientele should initiate litigation against the debtor. The purpose for such a model is to increase the likelihood debtors have the means and ability to pay a prospective judgment should

EPA or its clients institute litigation against the debtor for damages arising from an unpaid collections account. The predictive model looks to ensure that additional socio-economic pressures are not placed on debtors unable to pay a past due account. Last, the scoring model is intended to protect the reputation of EPA's banking clientele from negative perception as greedy or cold-hearted or discourage new customers from conducting business with the bank or credit union.

17.     Knap's confidential trade secret information is used in its business as debt collector, such information was procured at significant expense to Knap and EPA, provides Knap and EPA significant competitive advantage in the debt collections industry because such information would be extremely costly to develop, and would require considerable time and effort for a competitor to independently develop. In addition, because some of the information contained within Knap's confidential trade secret information constitutes consumer credit information as that term is defined under 18 U.S.C. ch. 47 § 1028, disclosure or dissemination of such information is strictly prohibited according to federal statute.

18.     Knap's trade secrets are not known to the public, and R2P Invest had no knowledge of Knap's development of this information during Knap and R2P Invest's joint-venturer relationship. R2P Invest's general knowledge of debt collection, and its experience in debt collection industry, does not include any of the valuable trade secret information contained within Knap's trade secrets.

19.     Knap compiled approximately 1,016 debtor files which had confidential trade secret information over a four (4) year period. Under federal statute, all such information was required to be stored at an offsite secure storage facility and with minimum security measures to protect the unauthorized access, disclosure, or dissemination of any consumer credit information. PhoenixNap, a secure storage facility provider provides multiple layers of security protection of

Knap's trade secret information as well as multiple credentials due to such information's protections from unlawful disclosure or dissemination pursuant to federal statute, as the server facility which holds the database developed by Knap and used in EPA's business.

20.     R2P Invest, a shareholder of the corporation of which EPA is a subsidiary, knew of the confidential nature and significant competitive value of Knap's trade secret information in the debt collection industry. Knap, individually and on behalf of EPA, maintained strict security policies and procedures to address EPA employee obligations to maintain the strict confidentiality of Knap's trade secrets, and regularly advised and trained employees of the requirement each employee provided with access to Knap's database of the need for compliance with such policies.

**B. R2P devises a campaign to shut out Knap from the company and block his access to Knap's trade secret information.**

21.     On September 9, 2023, R2P Invest, nonparticipating shareholders of EPA's parent corporation, embarked on a secretive campaign with its purpose to exclude and expel Knap from owning or participating in EPA's business, a business Knap solely developed from a small debt collection agency to a leader in the industry. On September 9, 2023, R2P Invest demanded Knap sign a letter agreement, a true and correct copy of which has been annexed hereto and incorporated by reference as **Exhibit A**. The letter agreement, among other things, demanded that Knap transfer his 33.4% ownership interest to R2P Invest for no consideration whatsoever, and demanded Knap to resign from EPA—a company successful in its industry solely through the efforts, hard work, and develop of proprietary information by Knap. Additionally, the letter agreement demanded Knap relinquish to R2P Invest Knap's credentials regarding three portfolios of debt purchased and owned by EPA which EPA collects, required Knap send a formal letter to each EPA client that he was formally resigning from EPA, provide the record balances of each account EPA was servicing, submit all profit and loss statements of EPA as of October 10, 2023, and finally, demanded Knap

deliver his credentials of NPL of Loanme, NYCU, and ASE CU, no later than October 13, 2023.

22.     To strongarm Knap into signing the letter agreement, R2P Invest maliciously highjacked and held hostage Knap's access to the database and scoring model, handicapping EPA's ability to conduct its daily business operations, and effecting a hostile takeover of EPA's accounts and business.

23.     Because R2P terminated Knap's access to the PhoenixNap server, Knap signed the letter agreement under protest and duress, and because Knap was promised that upon signing the letter agreement Knap would again be given access to the PhoenixNap server. Unfortunately, R2P Invest did not honor its promise to restore Knap's access to the server and has supplied only limited, intermittent access to the PhoenixNap server since September 26, 2022.

24.     The final provision in the letter agreement tries states that the agreement shall be governed under the jurisdiction of Singapore. While it is well-settled principles of contract law that parties may contract under whatever terms and consideration, they so desire, the parties cannot contract with each other in violation of public policy. The letter agreement relates to a collection agency lawfully operating within the United States which contains sensitive, consumer credit information strictly protected under federal statute from dissemination, disclosure, or unauthorized access. Plaintiffs allege and strongly assert that public policy concerns and the protection of sensitive, consumer credit information of its citizens overrides having the agreement's jurisdiction being governed by a country with no interest in protecting its citizens consumer credit information other than the United States.

## CLAIMS FOR RELIF

### Count 1—Defend Trade Secrets Act Violation
### (Against all Defendants)

25.     Plaintiffs incorporates by reference each and every allegation in the preceding

paragraphs as if fully set forth herein.

26.     Plaintiffs bring this action under the Defend Trade Secrets Act, 18 U.S.C. 1836, which defines a trade secret as all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through improper means by another person who can obtain economic value from the disclosure or use of the information. 18 U.S.C. § 1839(3).

27.     Under the DTSA, misappropriation of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means, or was acquired by improper consent, whether express or implied by a person who: (I) used improper means to acquire knowledge of the trade secret; or (II) at the time of disclosure or use, knew or had used improper means to acquire the trade secret… or; (III) derived from or through another person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret. 18 U.S.C. 1839(5).

28.     Improper means under the DTSA as that term is defined is: (A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition. 18 U.S.C. 1839(6).

29.     The confidential trade secret information of Knap and EPA constitutes trade secrets

related to a product or service used in, or intended for use in, interstate commerce, including but not limited to, all types of financial and business data, methods, procedures, programs, or codes, whether tangible or intangible, which Knap and EPA developed such information over significant time and expense which could not be reverse engineered by another party or by independent derivation.

30. The information developed and owned by Knap and EPA which is contained on the PhoenixNap server provides Knap and EPA independent economic benefit, and such information is not generally known to the public. Moreover, such information contains consumer credit information the disclosure of which is strictly prohibited by law.

31. Knap and EPA take reasonable and more particularly strict measures to protect its trade secrets. These measures include password protected databases, dual layer database access protection, and is stored offsite by a private professional server database provider certified to provide security measures for financial information.

32. All Defendants, by blocking and prohibiting Knap's access to such information, have acquired, threatened disclosure, and utilized Knap and EPA's trade secrets without proper consent and for their own personal gain to the detriment of other shareholders of EPA, including Knap.

33. EPA and Knap have suffered damages in excess of $5,000.00, due to the Defendants violation of the DTSA, including of loss of business revenue, employees, EPA's name within the collections industry and goodwill, and potential harm to its hard-working reputation among its customers and in the collections industry.

34. Absent temporary and permanent injunctive relief, Knap and EPA will continue to be caused irreparable which Plaintiffs request the Court award Plaintiffs damages as well as

temporary and permanent injunctive relief supplying Plaintiff access to the information located on the PhoenixNap servers.

### Count 2—Computer Fraud and Abuse Act, 18 U.S.C. § 1030
**(Against all Defendants)**

35.  Plaintiffs incorporate by reference each allegation in the preceding paragraphs as if fully set forth herein.

36.  Plaintiffs' internal computers and databases and related trade secrets are used in interstate commerce.

37.  All Defendants, by prohibiting Plaintiff's access to the information located on the PhoenixNap servers, knowingly and with the intent to defraud, accessed Plaintiffs' protected database files and by means of such conduct, defrauded Plaintiffs, shareholders of EPA, of information of substantial value.

38.  The conduct described above has affected and continues to affect interstate commerce. This conduct has caused and will continue to cause Plaintiffs damages well in excess of $5,000.00.

39.  Plaintiffs have suffered damages and more particularly irreparable harm by the improper access to Plaintiffs' trade secret information by the Defendants, including the loss of customers and employees, harm to its reputation and goodwill, and an unfair reduction to Plaintiffs competitive advantage.

40.  Plaintiffs are entitled to its actual economic damages from all defendants, jointly and severally, and for Plaintiffs' reasonable and necessary costs of suit in prosecuting this action.

### JURY DEMAND

41.  Plaintiffs hereby assert its right to a trial by jury and makes this demand for a jury trial. Plaintiffs will tender any required jury trial fee.

## DAMAGES AND PRAYER FOR RELIEF

42.     WHEREFORE, Plaintiffs hereby respectfully request this Honorable Court award judgment against all Defendants, jointly and severally, as follows:

    a.  Damages to be determined at trial including compensatory, exemplary, consequential, punitive, and restitutionary damages;

    b.  Temporary and Permanent Injunctive Relief granting Plaintiffs access to the information located on the PhoenixNap server; and,

    c.  Any additional relief this Court deems just and reasonable.

Dated: October 25, 2023              Respectfully Submitted,


*/s/ Nicholas L. Everett*
Nicholas L. Everett
Texas Bar No. 24087005
514 Hampton Hill Dr.
Tyler, Texas 75703
Ph: (903) 530-1115
Email: nick@etxtaxlaw.com

**Attorney for Plaintiffs**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

KAMIL KNAP and EPA USA, *Inc.*  §
    Plaintiffs,  §
                 §
                 §
vs.  §    Civil Action No. _____
                 §
R2P INVEST PTE.LTD., VIKTOR  §
DOKUCAJEV, and LUBOS ZOVINEC,  §
    Defendants.  §

## DECLARATION OF KAMIL KNAP

I, Kamil Knap, pursuant 28 U.S.C. § 1746, declare as follows under penalty of perjury:

1.    I submit this declaration contemporaneously with my Original Complaint for Damages and Injunctive Relief, as well as a forthcoming Motion to Compel For Seizure Order, Temporary Restraining Order, and Preliminary Injunction.

2.    I am over 21 years old, have never been convicted of a felony or crime of moral turpitude, am of sound mind and otherwise fully capable to make the declarations contained herein.

3.    The facts set forth in this Declaration are within my personal knowledge and true and correct.

4.    I am a Slovakian national citizen, lawful holder of an E-2 Investor issued by the U.S. Customs and Enforcement Service. I attended management training courses at Stanford University in Palo Alto, California, in 2018, and have resided with my family in Phoenix, Arizona since 2020.

5.    In 2019, I was the primary promoter and original organizer for EPA USA, *Inc.*, a corporation duly organized and existing under the laws of the state of California. EPA is a subsidiary of El Palo PTE.LTD., a Singapore corporation. El Palo PTE.LTD.'s ownership

comprises two (2) shareholders: I own 33.4% from an initial capital contribution and as part of my compensation due to four (4) years of continuous employment as President/Director of EPA; and R2P Invest owns the remaining 66.6% from its initial capital contribution at EPA's formation combined with a convertible debt instrument in 2022. No other individual or entity owns any issued and outstanding capital shares of EPA. Annexed to this Declaration as **Exhibit A** is a diagram displaying each ownership interest of EPA regarding each individual or entity who owns any outstanding and issued capital shares of EPA.

6. I am familiar with Dokucajev and Zovinec due to previous business relationships formed in Singapore many years ago. The Defendants and I do not engage in any other type of joint-venturer relationship or shareholder relationship of any entity.

7. As a debt collector lawfully conducting business under the FDCPA that affects interstate commerce, EPA contracts with many banks, financial institutions, lenders, underwriters, and credit unions scattered across the southwestern U.S. Each service contract whereby EPA acts as the collection agency for a bank or credit union, initially started as smaller contracts to service significantly smaller debt obligations. It is my assumption and belief each bank or credit union wanted to observe EPA's ability to collect on a minimum threshold amount of collection accounts and determine EPA's return on investment for each account EPA serviced for its banking clients which was successful either through collection efforts or through litigation. Once EPA demonstrated its ability to handle thousands of accounts for each client and provide a substantial return on investment for each bank, EPA was progressively over time additional accounts worth substantially higher dollar amounts to collect for our banking clientele.

8. When EPA was initially organized in 2019, the company did not have a diverse book of business or accounts to collect for banking clientele. It was only after my sole efforts to

contact various financial institutions, make introduction to the collections representative for each bank, and typically make multiple flights to each respective to discuss EPA's services before EPA was even provided any contracts to service the bank's collection accounts. Additionally, EPA did not reach profitability until November 2022. Dokucajev and Zovinec made no efforts whatsoever to assist in bringing clients to EPA, nor did they participate in the day-to-day management or affairs of EPA; instead, all Dokucajev and Zovinec have done is collect profits from EPA and the increased valuation of EPA.

## A. I Developed Trade Secrets Vital to Epa's Daily Business Operations Which The Defendants Played No Role In Nor Had Any Knowledge.

9.      As an essential part of EPA's business practices, I have developed and compiled over a significant amount of time certain proprietary information, including but not limited to customer information of EPA's banking clients whose accounts are identified in default, uncollectable, or charged-off; the names and contact information of those customers identified by EPA's bank clientele along with a contact number either for the principal abode of each debtor or the debtor's place of employment; the past due balance for each bank customer whose account has been identified as in default, uncollectable or charged-off; and, the contractual documentation evidencing each customer-debtor balance to the bank.

10.      In addition, the confidential trade secret information I have developed contains public data drawn from various public databases that assist in assigning a numerical score for each debtor's ability to pay on a past due account owed to EPA's banking clientele; the average income for each zip code each debtor resides compared to the average income for the entire U.S.; detailed skip trace information including the current and previous property owned by each debtor and the respective value of such real property; the number of current and previous vehicles owned by each debtor and, when appropriate, the approximate value of each vehicle; and, if available, the

employment information of each debtor and the debtor's estimated annual salary.

11.     Once I place this information into a proprietary software and database, a numerical score is generated regarding each debtor, which serves as a threshold or baseline whether EPA or its banking clientele should initiate litigation against the debtor. The purpose for such a model is to increase the likelihood debtors have the means and ability to pay a prospective judgment should EPA or its clients institute litigation against the debtor for damages arising from an unpaid collections account. The predictive model seeks to ensure that additional socio-economic pressures are not placed on debtors unable to pay a past due account. Last, the scoring model is intended to protect the reputation of EPA's banking clientele from negative perception(s) as greedy or cold-hearted or discourage new customers from conducting business with the bank or credit union.

12.     The confidential trade secret information I developed and compiled is used in EPA's business as debt collector, such information was procured at significant expense, provides my company significant competitive advantage in the debt collections industry because such information would be extremely costly to develop, and would require considerable time and effort for a competitor to independently develop. In addition, because some of the information contained within the confidential trade secret information constitutes consumer credit information as that term is defined under 18 U.S.C. ch. 47 § 1028, disclosure or dissemination of such information is strictly prohibited according to federal statute.

13.     Over time compiled approximately 1,016 debtor files which had confidential trade secret information over a four (4) year period. Under federal statute, all such information had to be stored at an offsite secure storage facility and with minimum security measures to protect the unauthorized access, disclosure, or dissemination of any consumer credit information. PhoenixNap, a secure storage facility provider provides multiple layers of security protection of

the trade secret information as well as multiple credentials due to such information's protections from unlawful disclosure or dissemination pursuant to federal statute, as the server facility which holds the database developed by me and used in EPA's business.

14.     R2P Invest, a shareholder of the corporation of which EPA is a subsidiary, knew of the confidential nature and significant competitive value of this trade secret information in the debt collection industry. I, personally, and on behalf of EPA, maintained strict security policies and procedures to address EPA employee obligations to maintain the strict confidentiality of the trade secrets, and regularly advised and trained employees of the requirement each employee provided with access to the database of the need for compliance with such policies.

## B. R2P devises a campaign to exclude me from the company and block my access to my personally developed trade secret information.

15.     On or about September 9, 2023, R2P Invest, stakeholders of EPA, embarked on a secretive campaign with its purpose to exclude my access and ultimately misappropriate the information located on the server to a location outside the U.S., which upon and belief, is in location in the Czech Republic, beyond my access. On or about September 9, 2023, R2P Invest demanded I sign a letter agreement, a true and correct copy of which has been annexed hereto and incorporated by reference as **Exhibit B.** The letter agreement, among other things, demanded I transfer my 33.4% ownership interest to R2P Invest for no consideration, and demanded I     resign from EPA—a company successful in its industry solely through the efforts, hard work, and development of proprietary information solely through my efforts. Additionally, the letter agreement demanded me relinquish to R2P Invest three different debt portfolios purchased by EPA over the years which EPA collects on its own. Further, the letter agreement required me send a formal letter to each EPA client that I was formally resigning from El Palo Alto PTE.LTD., provide the record balances of each account EPA was servicing, submit all profit and loss statements of

EPA as of October 10, 2023, and finally, demanded I deliver my credentials to three (3) debt portfolios purchased by EPA in 2020, no later than October 13, 2023.

16.     To strongarm me into signing the letter agreement, R2P Invest maliciously highjacked and held hostage my access to the database and scoring model, handicapping EPA's ability to conduct its daily business operations, and effecting a hostile takeover of EPA's accounts and business.

17.     Because R2P Invest, Dokucajev and Zovinec, individually and in concert with another, ended my access to the PhoenixNap server, I reluctantly signed the letter agreement under duress and protest. Also, upon signing the letter agreement, I was promised my access to the PhoenixNap server would be restored. Unfortunately, R2P Invest did not honor its promise to restore my access to the server and has supplied only limited, intermittent access to the PhoenixNap server since October 15, 2023.

18.     Finally, the letter agreement tries to have each provision contained therein be governed under the jurisdiction of Singapore. It is my position that the agreement relates to a collection agency lawfully operating within the United States, and the information at stake that has been misappropriated contains sensitive, consumer credit information strictly protected under federal statute from dissemination, disclosure, or unauthorized access, such that the U.S. Court system has an overriding interest in interpreting, enforcing, or invalidating the letter agreement.

Further affiant sayeth nought.

Dated: _Nov 11_____, 2023.

By:_____
Kamil Knap, President/Director of EPA USA, *Inc.*



**Lubos Zovinec**
Czech Citizen

Supervisory board

**r2p invest SICAV, a.s.**
Investment fund in Czech republic

shareholder

**Viktor Dokucajev**
Czech Citizen

shareholder

**Jakub Raso**
Czech Citizen

**Necrosoft s.r.o**
Czech republic

software solution and support

**Kamil Knap**
Slovak

33.40%

**EL PALO ALTO PTE. LT(**
Singapore

**R2P Invest  Pte. Ltd.**
Singapore

66.60%

portfolios

Around the globe

shareholder

**MBA Consult Pte. Ltd**
Singapore

shareholder

Debt collection companies
around the world

software solution and support

100%

**EPA USA Inc.**
California

Arizona

# AGREEMENT

This Agreement, hereinafter referred as **"Agreement"**, is made on 26/09/2023

Between

**R2P INVEST PTE.LTD.** company registered in Singapore under number 201824206H with registered office at 600 NORTH BRIDGE ROAD, #23-01 PARKVIEW SQUARE, SINGAPORE (188778), hereinafter referred as **"R2P SG"**,

**EL PALO ALTO PTE.LTD.** company registered in Singapore under number 201831833K, with registered office at 33 LORONG 32 GEYLAND #06-04, LOFT 33, hereinafter referred as the **"Company"**

And,

**KAMIL KNAP**, with passport number BE7185406, residing at 33 Lorong 32 Geyland #06-04, LOFT 33, (398293) Singapore, hereinafter referred as **"KAMIL"**.

**WHEREAS,**

1. **R2P SG** is the **Shareholder** of the **Company**, holding the 66,67% of the shares.
2. **KAMIL** is the **Shareholder** of the **Company**, holding the 33,33% of the shares, and the sole **Director** of the **Company**.
3. **The Company** is 100% owner of a US company, **EPA USA Inc.**

**WHEREAS,**

4. The **Company** had debt (loans) towards **Snapcore a.s.** and **EPA USA Inc.** had dept (loans) towards **R2P SG.**
5. The debt of **EPA USA Inc.** was assigned to the **Company**
6. On **09/09/2022** the total amount of debts **847.664,52 USD** (eight hundred forty-seven thousand six hundred sixty-four US dollars and fifty-two cents) was converted into capital and additional shares were issued in the Company.
7. On **10/12/2022, R2P SG** sent **20.000 SGD** (twenty thousand Singapore dollars) to the **Company** to pay the shares before the additional shares as per Clause 6.
8. By the end of 2022, **R2P SG** had repaid Snapcore a.s. the debt that was owed to it by the **Company.**
9. On **22/02/2023**, a Loan Agreement was signed between **R2P SG** and **EPA USA Inc.**, where **R2P SG** lent an amount of **20.000 USD** (twenty thousand US dollars) with annual interest rate of 15% to **EPA USA Inc.**

10. **R2P SG** has been Employer of **KAMIL** since **11/11/2022** with monthly salary of **9.500 SGD** (nine thousand five hundred Singapore dollars), and therefore granted him with Residence permit in Singapore.

**And WHEREAS,**

11. It is decided that, **R2P SG**, and all the related parties to it (MBA Consult Group, Snapcore a.s. and r2p Invest SICAV a.s.) are terminating their cooperation with KAMIL.

**NOW AND THEREFORE, BETWEEN R2P SG AND KAMIL, IT IS AGREED,**

A. **R2P SG** keeps the employment of **KAMIL** active until 31/12/2023 <u>without paying</u> him salary.

B. **KAMIL** sends within 2 (two) weeks, starting from 25/09/2023 until 09/10/2023, PnL, Balance Sheet and General Ledger of **the Company** and **EPA USA Inc.**

C. **KAMIL** willingly transfers the 33,33% of his shares of the **Company** to **R2P SG,** and **R2P SG** becomes 100% owner of the **Company. By 16/10/2023.**

D. **KAMIL** resigns from being the director of the **Company. By 16/10/2023.**

E. **KAMIL** hands over to **R2P SG** his access codes to ACRA (Accounting and Corporate Regulatory Authority). **By 16/10/2023.**

F. **KAMIL** <u>sends</u> official e-mail to all banks, in which the **Company** has account at, and <u>informs</u> them about the termination of his relationship with the **Company,** <u>records</u> the balances on all accounts dated 26/09/2023, and <u>gives</u> access to all accounts to **R2P SG. By 16/10/2023.**

G. **KAMIL** delivers to **R2P SG**, the NPLs of LoanMe, NYCU and ASE CU. **By 13/10/2023.**

H. ~~KAMIL will pay back the loan of 20.000 USD and the interest, which will be~~ calculated up to date when the loan will be returned. **By 31/12/2023**

I. **KAMIL** will transfer **EPA USA Inc.** to his name, and thus **EPA USA Inc.** will be no longer a subsidiary of the **Company. By 16/10/2023.**

J. **EPA USA Inc.** will be granted 2 (two) months of use of the software program DebThor. **Until 25/11/2023.**

**FINAL PROVISIONS**

All the terms of the Agreement shall be governed by the Jurisdictions of Singapore.

Shall any of the terms be not fulfilled or not met, **R2P SG** will have the right to file a lawsuit.

**IN THE WITNESS WHEREOF, THE CONTRACTING PARTIES SIGNED THIS AGREEMENT AS FOLLOWS:**

R2P INVEST PTE LTD.

KAMIL KNAP

EL PALO ALTO PTE.LTD.

**Subject:** 2023-10-07 Document signed
**Date:** Saturday, October 7, 2023 at 3:20:21 PM Central Daylight Time
**From:** Kamil KNAP | EPA USA Inc. <kamil.knap@epa-usa.com>
**To:** Nicholas Everett <nick@etxtaxlaw.com>
**Attachments:** image001.png, image002.jpg, image003.png, image005.png, image006.png, 2023-09-26 Signed document.pdf

Hello Nick,

Allow me to share with you a signed document & the proof the access to our system was blocked on Sept 22nd

All communication:

Sept 22, 2023: MBA (IT, Jakub head of IT): Ahoj. Dostal jsem za ukol od Viktora vypnout Debthor (Hi. I have got a task to stop Debthor by Viktor
Sept 22, 20233: Kamil: It is ok, I know about it. Thank you very much.



AGREEMENT IS SIGNED (attachment)

**Next communication:**

Then turn on and moved to location outside of US on Oct 28th
**Sept 28, 2023:**
Kamil: Ahoj, prosím o spuštění systému
MBA (Jakub IT): ahoj, slysel jsem. Napisu az budes moct (Hi, I heard. I will write you once I will be available)
Kamil: dekuji (Thank you)
MBA (Jakub IT):  Takze Debthor zprovoznen. ALE: (Debthor is turned on, BUT:)
1) DebThor je presunut zpatky do CR, takze nejde volat, ale na data muzete koukat.  (Debthor is back in Czech republic, so you can not call, but you can look on it)
2) Hosting u Phoenix NAP muzes zrusit (You can cancel the hosting at PhoenixNAP)
3) VPN pouzivejte pouze na Mikrotiku, z offisu to bude chodit na primo bez VPN.  (VPN use Mikrotik only in the office, it will work without VPN)
4) jestli budes migrovat data nekam na jiny soft, tak to rekni dopredu abychom to mohli pres nejake API povolit na nasi strane.  (If you will go to other software, please let me know first so we can allow API)



And again switched off on this Wednesday the 4th of October:
Kamil: ahoj, mame zase system dole (Hi, our system is down again)
MBA (Jakub): ahoj ano. na pokyn vedeni jsme ho vypnuli (Hi, yes, we have been told to switch the system off)



Best regards,



**Kamil Knap**
President Director



EPA USA Inc.
**Trust Empowers**

| | |
|---|---|
| Mobile: | 909 616 8458 |
| Office: | 480 409 1540 |
| Phoenix: | 112 N. Central Ave. #600D |
| | Phoenix, AZ 85004 |

The information contained in this e-mail is confidential and intended for the named recipient(s) only. Suppose you are not an intended recipient of this e-mail you must not copy, distribute, or take any further action in reliance upon it, and you should delete it and notify the sender immediately. E-mail is not a secure method of communication. EPA USA Inc. cannot accept responsibility for the accuracy or completeness of this message or any attachment(s). This e-mail is intended for information purposes only and is not a solicitation or offer to buy or sell securities or related financial instruments.